NOT FOR PUBLICATION (Doc. Nos. 35, 37)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| MALIKIA WASHINGTON, : : Plaintiff, : : v. : : THIELE MANUFACTURING, LLC, : FIRST VEHICLE SERVICES, : : Defendants. : : THIELE MANUFACTURING, LLC, : : Cross-Claimant, : : v. : : FIRST VEHICLE SERVICES, : : Cross-Defendant. : : FIRST VEHICLE SERVICES, : : Third-Party Plaintiff, : : v. : : SWENSON SPREADERS, LLC, : : Third-Party Defendant. : | Civil No. 10-685 (RBK/JS)<br><br>**OPINION** |

**KUGLER**, United States District Judge:

Presently before the Court in this matter are the summary judgment motions of Defendant

Thiele Manufacturing ("Thiele" or "Defendant Thiele"), Doc. No. 35, and Third-Party Defendant

Swenson Spreaders, LLC ("Swenson" or "Third-Party Defendant Swenson"), Doc. No. 37. Thiele has moved for summary judgment on the claims raised by Malikia Washington ("Plaintiff"), and Swenson has moved for summary judgment on claims raised by Third-Party Plaintiff First Vehicle Services ("FVS," a Defendant in the case initially brought by Plaintiff Washington). Because Plaintiff has presented no evidence to rebut Thiele's showing that its manufacture of the body of the truck in question played no part in Plaintiff's injury, Defendant Thiele's motion is granted. Because Third-Party Plaintiff FVS has failed to raise a genuine issue of material fact as to the third element of its design-defect claim, the motion of Third-Party Defendant Swenson is granted.

## I.   BACKGROUND

On January 17, 2008, Plaintiff, an employee of the Atlantic City Streets Division, was allegedly asked to clean out the spreader attached to a salt truck owned by Atlantic City. Compl., ¶ 20. Plaintiff alleges that, in order to clean the spreader, "Plaintiff was required to lift up and reach over the back of the auger in order to properly clean and maintain the spreader." Id. at ¶ 21. Plaintiff claims that, because of the allegedly "defective and dangerous condition of the rear auger design," Plaintiff could only properly clean the blades while they were powered on, and the blades were spinning. Id. at ¶ 22. While Plaintiff was cleaning the spreader, Plaintiff's right sleeve because caught on the rotating blades, and Plaintiff was pulled up by the rotating machinery, and his arm up to his shoulder became trapped in the auger until the Fire Department was able free Plaintiff's arm—a period of about two hours. Id. at ¶¶ 21-24. Plaintiff claims to have suffered "numerous injuries including, but not limited to, multiple compound fractures, major blood loss, tissue and nerve damage, and irreversible damage to his arm," which have caused Plaintiff to incur substantial medical expenses. Id. at ¶¶ 25-26. Plaintiff also claims

to have suffered "pain, discomfort, frustration, embarrassment, inability to attend to usual and daily activities, loss of enjoyment of life's pleasures, scarring, and will suffer same for an indefinite time into the future." Id. at ¶ 27.

The truck in question was "a commercial Ford truck with an accompanying rear auger attachment." Id. at ¶ 11. Plaintiff alleges that the Atlantic City Streets division purchased the truck with the rear attachment from Defendant Thiele and/or Monroe Truck Equipment. Id. Alleging that "[t]he subject commercial truck with rear auger was designed, manufactured, installed and constructed by Theile [sic] and/or Monroe without appropriate warnings," Plaintiff filed the instant lawsuit against both Thiele and Monroe on a strict liability theory. On December 13, 2010, Plaintiff and Defendants stipulated to the dismissal of all claims and cross-claims against Monroe, pursuant to Federal Rule of Civil Procedure 41(a)(1). Doc. No. 20. Defendant Thiele moved for summary judgment on January 5, 2012, and that motion remains unopposed.[1] Doc. No. 35.

In its initial Complaint, Plaintiff also sued Defendant FVS for negligence. FVS allegedly had a "service and/or inspection agreement with the City of Atlantic City, New Jersey, to inspect and/or maintain a fleet of trucks and/or machinery, including . . . the subject Ford truck with rear auger design." Id. at ¶ 19. In its Complaint, Plaintiff alleged that FVS "knew or should have known, at the time of [its] inspections that it was foreseeable that workers, like Plaintiff, would be subjected to a hazard which could result in catastrophic injury or death when cleaning or maintenance personnel was operating and/or cleaning and maintaining the rear spreader/auger" because of "the defective design on the non-hinged rear auger door and/or the lack of an

---

[1] Even when a motion for summary judgment appears to be unopposed, the Court must still determine whether it has been properly made and supported by the moving party. See Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990) (holding that a local rule deeming unopposed motions to be conceded did not justify the grant of summary judgment without analysis under Rule 56(e), Fed. R. Civ. P.).

3

interlocking door mechanism." Id. at ¶¶ 38-39.  Plaintiff further alleged that "the use of a hinged rear auger door" could avoid injuries like that suffered by Plaintiff.  Id. at ¶ 39.  Since filing its Complaint, Plaintiff has refined its initial allegations to claim that "alterations [were] made to the subject spreader from its original design, including the bottom [auger] door being bolted shut with two bolts, the left handle missing, a missing quick disconnect fitting and absent on-product warnings."  Def.'s Br. in Support of Motion to Exclude Expert Testimony of Timothy Joganich, 2 (citing Joganich Report, Ex. A, Def.'s Br. to Exclude Joganich).  For this reason, Plaintiff—through its expert—now concludes that FVS failed to satisfy its duty to maintain the spreader in a safe condition.  Id.

On January 14, 2011, FVS filed a Third-Party Complaint against Swenson Spreaders, LLC, the manufacturer of the salt spreader.  Doc. No. 22.  FVS alleged that "Swenson Spreader . . . knew or reasonably should have known that its spreaders and their component parts would, from time to time, require routine washing and cleaning and owed a duty to foreseeable users, including plaintiff, to exercise due care in the design, manufacture, installation, distribution and sale of the spreader involved in the action."  FVS Compl., ¶ 11.  Furthermore, the Complaint alleged, the subject spreader "manufactured, installed, distributed and sold" by Swenson was "not reasonably fit, suitable or safe for its intended purpose."  Id. at ¶ 12.  Swenson should have known, FVS alleged, that "a safer, alternative design existed" that had "adequate warnings, cautions, instructions, safety devices, protection, guarding and clean-out access."  Id. at ¶¶ 14-15.  FVS further claimed that Swenson's failure to include adequate safeguards such as those listed, "was a proximate cause of the accident out of which this lawsuit arises."  Id. at ¶ 17.

II.   **STANDARD**

   **A. Choice of Law**

4

Because the Court hears this case pursuant to its diversity jurisdiction, 28 U.S.C. § 1332, it must apply state substantive law and federal procedural law. Gasperini v. Ctr. for Humanities, 518 U.S. 415, 427, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996) ("Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."). In this case, because Plaintiff brings his claim against Defendant Thiele pursuant to the New Jersey Product Liability Act, N.J.S.A. 2A:58C-1 et seq., the Court applies the substantive law of New Jersey. Moreover, because Third-Party Plaintiff FVS brings its claims against Third-Party Defendant Swenson under the New Jersey Product Liability Act, as well as the New Jersey Tortfeasors Contribution Act, N.J.S.A. 2A:53A-1 et seq., and the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 et seq., the Court also applies New Jersey substantive law to those claims.

**B. Summary Judgment**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing'— that is, pointing out to the

5

district court—that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party satisfies this initial burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder, not the district court. BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III. DISCUSSION

**A. Defendant Thiele's Motion for Summary Judgment**

Defendant Thiele moves for summary judgment on Plaintiff's claims against it because "plaintiff and co-defendants cannot establish a cause of action for product defect under the New Jersey Product Liability Act, N.J.S.A. 2A:58C-1 et seq." Def. Thiele's Br. in Support of

6

Summary Judgment ("Thiele's Br. Summ. J."), 3.  Thiele acknowledges that it manufactured "the dump truck body on top of the Ford F-350 chassis" that Plaintiff drove, and to which the subject spreader was attached.  Thiele's Br. Summ. J., 7.  However, Thiele claims, "[a]ccording to the discovery in the case and the contentions of the parties' experts, plaintiff's injury was not caused by the truck, however, but rather by the removable Swenson salt spreader."  Id. at 10.

   Defendant Thiele is correct that "[t]here is no evidence that Thiele manufactured the salt spreader," and "[t]here is also no evidence that Thiele was the seller of the Swenson salt spreader."  Id. at 11.  Plaintiff alleged that Thiele "was engaged in the business of designing, manufacturing and distributing snow and ice control equipment including the aforesaid rear auger and component parts," Compl., ¶ 30; however, Thiele argues that its "exclusive distributor" in New Jersey was the Seely Company, and that although "[t]here is no paperwork available from Thiele or Seely regarding" the sale of this particular vehicle since "both Thiele and Seely are out of business," Thiele's "usual business practice" would have been to sell the dump truck body to Seely, who would then have sold it to a buyer (in this case, Plaza Ford/Motors Fleet, who then sold the truck with spreader to the City of Atlantic City in 1997).  Id. at 11; see also Deposition of Joseph Romano ("Romano Dep."), id. at Ex. K, 16-18; Resolution of the City of Atlantic City, No. 364, May 21, 1997, Ex. L, id. (resolving that the then-new subject dump truck with salt spreader would be purchased from Plaza Ford/Motors Fleet).  It is unknown which company attached the spreader to the truck, but Mr. Romano, who worked for Thiele in 1997, indicated that "Seely quite often did their own accessory installations," and that Thiele did not purchase Swenson spreaders itself because Seely was also the exclusive distributor for Swenson.  Romano Dep., 29.

7

Plaintiff does not contest these facts, nor does the record appear to contradict them. Indeed, as Thiele points out, Plaintiff's expert, Timothy Joganich, "contends that the accident was the responsibility of First Vehicle Services for modifications made to the salt spreader," and "makes no reference to any findings against Thiele." Thiele's Br. Summ. J., 8; see also Joganich Report (opining only as to the liability of Defendant FVS for Plaintiff's injuries, and not as to Defendant Thiele's liability). Accordingly, because Thiele presents evidence supporting its defense that it had no involvement with the purchase and installation of the salt spreader, because Plaintiff has not "ma[d]e a showing sufficient to establish the existence of [every] element essential to [its] case, and on which [Plaintiff] will bear the burden of proof at trial," as the shifting burden imposed by the summary judgment standard requires (Celotex, 477 U.S. at 322), and because Plaintiff appears to have changed its theory of liability to one that focuses on the bolting-shut of the spreader's rear auger door, Thiele's motion for summary judgment is granted.

### B. Third-Party Defendant Swenson's Motion for Summary Judgment

Third-Party Defendant Swenson has also moved for summary judgment on the claims filed against it by Third-Party Plaintiff FVS. FVS alleges that Swenson should reasonably have foreseen that its spreaders would "require routine washing and cleaning," and that Swenson therefore owed a duty to foreseeable users to "exercise due care in the design, manufacture, installation, distribution and sale of the spreader . . . ." FVS Compl., ¶¶ 10, 11. Because, FVS alleges, Swenson knew or should have known of a safer alternative design for its product, and failed to utilize that reasonably safer alternative, Swenson's spreader "created a defective and dangerous condition." Id. at ¶¶ 14-16. Accordingly, FVS claims, Swenson is liable for contribution under the New Jersey Tortfeasors Contribution Act, N.J.S.A. 2A:53A-1 et seq., and the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 et seq.

8

Third-Party Defendant Swenson moves for summary judgment on the grounds that, although Swenson manufactured the subject spreader, it had been "substantially modified since its date of manufacture in the 1990s." Third-Party Def. Swenson's Br. in Support of Motion for Summary Judgment ("Swenson's Br. Summ. J."), 1. To support this claim, Swenson points to a comparison of photographs of the subject spreader and an exemplar spreader. Id.; see also Joganich Report. Swenson claims that the spreader was in a "state of disrepair" at the time of Plaintiff's injury, that its warning labels had been removed, and that the spreader's lower tray, which was designed to provide easy clean-out, had been bolted shut. Id. Moreover, Swenson claims, that a "safety interlock quick disconnect" that was designed to "automatically shut[] off power to the auger when the hose [was] disconnected" had been "removed and replaced with permanent connections." Id. at 1-2.

Swenson argues that, because the spreader had been altered in these ways after its manufacture and after acquisition by the City of Atlantic City, Swenson cannot be said to have contributed to Plaintiff's injury. Central to Swenson's argument is its attempt to establish the condition in which the spreader was sold to Atlantic City. Specifically, Swenson points out that Atlantic City Resolution 364, according to which Atlantic City acquired the subject truck with attached spreader, was adopted pursuant to a bidding process wherein the City enumerated certain specifications, including that "[t]he unit will have a 7 gauge four point hinged bottom that, whe[n] released, exposes the entire length of the auger for easy cleanout, this hinged bottom shall be held in place by two heavy duty captive locks witha [sic] lift handle for convenient one man operation." "Specifications & Instructions to Bidders," Ex. G, Swenson's Br. Summ. J, 12. Resolution 364 indicated that

> the Specifications and Instructions to Bidders . . . , approved and adopted by the Council of the City on February 19, 1997, and the Proposal of the Contractor, received and

9

> publicly opened and read at a meeting of the Purchasing Board held April 15, 1997, . . . are hereby made a part and parcel of this Agreement as though each were set forth verbatim herein.

Resolution of the City of Atlantic City, Agreement, id., 2. Accordingly, Swenson argues, the City purchased a truck with attached spreader according to an agreement that required simple exposure of the auger for "easy cleanout."

Moreover, Swenson points out, FVS had a maintenance contract with Atlantic City, which required FVS to "perform a preventative maintenance evaluation on every piece of equipment in the Fleet to identify any deficient vehicle and make needed corrections." Swenson's Br., 4. Swenson indicates that this contract was in existence at the time of Plaintiff's injury in 2008, and "several years prior thereto." Swenson's Br. Summ. J., Statement of Material Facts ("SMF"), ¶ 22. Thus Swenson argues that it was FVS that did not correct the dangerous condition of the truck and spreader.

FVS, however, argues that Swenson is liable because Swenson failed in designing and manufacturing the spreader to implement an alternative design that would have rendered the spreader safer. This argument is raised through FVS's expert, Dr. David Anthony Pape. FVS's Br. in Opposition to Swenson's Motion ("FVS's Br. Summ. J."), 4. Dr. Pape opines that "the plaintiff's injury would not have occurred if the salt spreader was designed with a fixed guard." Id. Swenson argues that Dr. Pape's opinion does not meet the standards established by Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and that, accordingly, Dr. Pape's testimony should be excluded from this matter. Swenson's Br. Summ. J., 3. Third-Party Defendant Swenson correctly articulates that its motion for summary judgment hinges on whether or not the Court determines that there is a genuine issue of material fact as to whether or

10

not Swenson should have employed a safer alternative design than the one used to manufacture the subject spreader.

### 1. Testimony of FVS's Expert, David Anthony Pape

David Anthony Pape has doctoral, master's, and bachelor's degrees in civil engineering. Pape Biography, Pape Report, Swenson's Br. Summ. J., Ex. T.  He has worked in the heavy manufacturing industry, and was a professor of mechanical engineering for twenty-one years.  Id. Dr. Pape now works for Rimkus Consulting Group, Inc., where he consults on "mechanical failure evaluations of various systems and components including vehicles, pressure vessels, rotating equipment, mechanical products, and machinery."  Id.

Contrary to the opinions contained in the Joganich Report, Dr. Pape opines that "[t]he fact that bolts had been used to secure the bottom gate prior to this incident was not relevant, since the gate was only opened to remove clogs, and would not have been opened to remove excess material or for cleaning."  Pape Report, 6.  Rather, Dr. Pape explains, "[t]he safety of a product should always be paramount in any design."  Id. at 7.  However, "[t]he Swenson spreader/dump bed integration system presented several hazards of open exposed machinery." Id.  Because "the rotating auger and agitator cannot be eliminated as they were integral to the design of the spreader," "it was critical" for Swenson to control the hazards those parts caused by "enclosing or guarding it."  Id.  Moreover, Dr. Pape opines that "[a] guard would have been a simple, economical, robust, and effective means to prevent access to the rotating agitator and auger"; however, Swenson did not incorporate such a guard into its design.  Id. at 8.  Dr. Pape explained that a "heavy wire screen or cage fixed to the top of the dump bed at the spreader and extending a short distance towards the front of the truck would have prevented a person from coming into contact with the rotating shafts."  Id.  Dr. Pape reached this conclusion by examining the Swenson Installation and Operating Instruction Manual for the spreader, the SAE J515 Surface Vehicle Standard for a hydraulic hose, and the transcripts of many depositions

12

taken in this matter. He also researched spreaders on the Internet, and looked at spreaders similar to the one manufactured by Swenson. Swenson's Br. Summ. J., 11.

Swenson argues that Dr. Pape's testimony should be excluded, as Dr. Pape does not provide "evidence of the alternative design, has not actually designed such alternative, has not provided evidence that one exists, has not provided evidence that an alternative guard would work for its intended purpose or that it would be more safe than the current design." Swenson's Br. Summ. J., 10.

The admissibility of expert testimony is governed by Rule 702, which was amended in 2000 to reflect the Supreme Court decision in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993). The Rule provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. This Rule requires a court to act as a "gatekeeper" to ensure that expert testimony is both relevant and reliable. Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008). Rule 702 has a "'liberal policy of admissibility.'" Id. (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)). The burden of showing that expert testimony is admissible, once challenged, lies with the offering party. See Kannankeril, 128 F.3d at 807.

To be admissible, expert testimony must satisfy three requirements under Rule 702: (1) the witness must be an expert (i.e., must be qualified); (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge (i.e., must be reliable); and (3) the expert's testimony must assist the trier of fact (i.e, must fit). Id. at 806 (citing In re Paoli R.R. Yard PCB Litig. (Paoli II), 35 F.3d 717, 742 (3d Cir. 1994))); Elcock v. Kmart Corp., 233 F.3d

734, 741 (3d Cir. 2000) (stating three requirements are qualifications, reliability, and fit). An expert is qualified if he "'possesses specialized expertise.'" Pineda, 520 F.3d at 244 (quoting Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003)). The qualification requirement is liberally construed. Id.

A reliable opinion is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." Paoli II, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 589). The focus of the reliability inquiry is on the expert's principles and methodology, not on his conclusions. Daubert, 509 U.S. at 595. In determining reliability, a court may look to several non-exhaustive factors, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Elcock, 233 F.3d at 745-46 (quoting Paoli II, 35 F.3d at 742 n.8). The opinion cannot be based on assumptions that are "blatantly incorrect." Simon v. Weissmann, 301 Fed. Appx. 107, 116 (3d Cir. 2008); see also Player v. Motiva Enters. LLC, No. 02-3216, 2006 U.S. Dist. LEXIS 2288, 2006 WL 166452, at *7 (D.N.J. Jan. 20, 2006) (rejecting expert opinion that failed to discuss or recognize relevant facts), aff'd, 240 Fed. Appx. 513 (3d Cir. 2007).

Finally, an opinion fits a particular case (and thus helps the trier of fact) when there is a "'connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000) (quoting Paoli II, 35 F.3d at 743). Fit is an issue of relevance and simply means that scientific validity of the method or principles applies to the issues at hand. U.S. v. Ford, 481 F.3d 215, 220 n.6 (3d Cir. 2007). Merely because a method is reliable does not mean it applies in all cases. See

14

Daubert, 509 U.S. at 591 (discussing how phases of the moon may fit to show darkness, but not to show whether an individual was acting irrationally).

In this case, the Court finds that Dr. Pape, who holds a doctorate in civil engineering and has been a professor of mechanical engineering for two decades, is qualified to testify in this matter as to an alleged defect in machinery design and manufacture. Moreover, the Court finds that Dr. Pape's study of the spreader model involved in this case, in conjunction with his experience, gives him good grounds to opine that a spreader with a guard of the dimensions he describes may have been a safer alternative to the subject spreader. Though his testimony may be more likely to persuade a jury had Dr. Pape constructed the guard he describes, the lack of such a model does not render the opinion inadmissible.[2] Finally, Dr. Pape's testimony concerning the guard clearly fits this case, as the question of whether the lack of a safety guard constitutes a design defect is highly relevant to Swenson's potential liability. Because the Court finds that Dr. Pape may testify as an expert at trial, it will not hold a Daubert hearing on the issue.[3]

### 2. Summary Judgment Motion

The Court must now consider the possibility that, even taking into account Dr. Pape's opinion that the design of the spreader was defective because it failed to include a safety guard,

---

[2] "The fact that Daubert can be used in connection with summary judgment motions does not mean that it should be used profligately. A trial setting normally will provide the best operating environment for the triage which Daubert demands." Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999) (citing Cortes-Irizarry v. Corporacion Insular de Seguros, 111 F.3d 184, 188 (1st Cir. 1997).

[3] In certain instances, courts are obligated to provide an in limine hearing before applying Daubert to exclude expert testimony. Padillas, 186 F.3d 412. A hearing is required, for example, where the court excludes an expert's conclusions on the grounds that they are "insufficiently explained and the reasons and foundations for them inadequately and perhaps confusingly explicated." Id. In other words, where a report is "conclusory and [does] not adequately explain the basis for [the expert's] opinion or the methodology employed in reaching his conclusions," the "plaintiff needs an 'opportunity to be heard' on the critical issues of scientific reliability and validity." Oddi, 234 F.3d at 152 (quoting Padillas, 186 F.3d at 417). Where the evidentiary record is substantial, however, or the court has before it the information necessary to determine that the expert lacks "good grounds" for his conclusions, a hearing may be unnecessary. Id. at 153.

there may be no genuine issue of material fact as to Swenson's lack of liability.  "A prerequisite of any recovery under strict tort liability is the existence of a defective condition.  To succeed under a strict liability design-defect theory, a plaintiff must prove 'that the product was defective, that the defect existed when the product left the defendant's control, and that the defect caused injury to a reasonably foreseeable user.' Feldman v. Lederle Lab., 97 N.J. 429, 449, 479 A.2d 374 (1984)." Quincy Mut. Fire Ins. Co. v. Scripto USA, 573 F. Supp. 2d 875, 879 (D.N.J. 2008) (quoting Zaza v. Marquess & Nell, 144 N.J. 34, 49, 675 A.2d 620 (1996) (internal citations omitted)).

In this case, FVS argues—through Dr. Pape—that the spreader was defective because of Swenson's failure to design and manufacture a wire safety guard of the kind Dr. Pape describes.  Certainly, as explained above, Swenson's failure to design a guard would be more persuasive if an example of the guard had been provided, or even if Dr. Pape had identified a spreader manufacturer that employed such a guard.  However, despite its weaknesses, Dr. Pape's testimony does create a genuine issue of material fact for a jury to resolve as to whether or not the spreader was defective.  Accordingly, the first element of the design-defect analysis cited above is met.  Furthermore, if the spreader was defective for failure to include such a guard, then the second element of design-defect liability is necessarily also satisfied, since Swenson does not appear to contest that the spreader left its control without the guard.

Finally, Swenson indicates that Dr. Pape has opined that "it was not foreseeable, and indeed 'unprecedented' that plaintiff would use the spreader in the manner that he did on the date of the incident." Swenson's Br. Summ. J., 12.  Swenson argues that, "[i]f FVS' expert's testimony will be that it is unforeseeable and completely unprecedented for plaintiff to have used the spreader as he did, then FVS cannot carry its burden of proof on proximate cause" as to

Swenson's liability on a design-defect theory, id., since the third element of a design-defect claims is that the defect caused injury to a reasonably foreseeable user. Indeed, in Dr. Pape's deposition, he was asked "whether or not it was foreseeable that Mr. Washington would do as he did to try to clean that auger out[.]" Pape Dep., Swenson's Br. Summ. J., Ex. U, 46. Dr. Pape responded "[n]o, I don't believe it was foreseeable," and that "the way Mr. Washington cleaned out the truck, from what I understand, was unprecedented." Id. at 46-47.

Ordinarily, it is not the Court's role to police a party's arguments for inconsistencies. Moreover, the inconsistencies in Dr. Pape's testimony do not alter the fact that his testimony meets Daubert standards and therefore would be admissible at trial. Nevertheless, to sustain its design-defect claim against Swenson at the summary judgment stage, FVS must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Thus FVS is required to present evidence tending to show that Plaintiff's use of the spreader at the time of his injury was reasonably foreseeable. FVS has not done so. In addition to offering evidence—Dr. Pape's testimony—that shows just the opposite (i.e., that Plaintiff's manner of using the spreader at the time of his injury was not foreseeable), FVS points to no contrary evidence that would aid it creating a genuine issue of material fact for trial as to whether or not Plaintiff's use of the spreader at the time of his injury was reasonably foreseeable. Accordingly, FVS has failed to make out a genuine issue of material fact as to an essential element of its claim against Swenson, the Court will grant summary judgment on FVS's claims against Swenson.

## IV.     CONCLUSION

For the foregoing reasons, the motion of Defendant Thiele (Doc. No. 35) is **GRANTED** and the motion of Third-Party Defendant Swenson (Doc. No. 37) is **GRANTED**. An accompanying Order shall issue today.


Date: 5/11/2012                                                                                  /s/ Robert B. Kugler
                                                                                            ROBERT B. KUGLER
                                                                                            United States District Judge